RECEIVED
MAR 2 4 2010
3-24-10
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jose M Flores-Gomez )
_____ )
_____ )
_____ )
(Name of the plaintiff or plaintiffs) )
v. )
Lavy Restaurants D/B/A )
Spiaggia Restaurant and )
Cafe )
(Name of the defendant or defendants) )

10cv1850
Judge William J. Hibbler
Magistrate Martin C. Ashman

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

1. This is an action for employment discrimination.

2. The plaintiff is Jose M Flores-Gomez of the county of Cook in the state of IL.

3. The defendant is Lavy Restaurants, whose street address is 980 N Michigan Ave, (city) Chicago (county) Cook (state) IL. (ZIP) 60611
(Defendant's telephone number) (___)-_____

4. The plaintiff sought employment or was employed by the defendant at (street address) Spiaggia Restaurant and Cafe (city) Chicago (county) Cook (state) IL. (ZIP code) 60611

5. The plaintiff [check one box]
   (a) ☐ was denied employment by the defendant.
   (b) ☐ was hired and is still employed by the defendant.
   (c) ☒ was employed but is no longer employed by the defendant.

6. The defendant discriminated against the plaintiff on or about, or beginning on or about, (month) **June**, (day) _____, (year) **2007**.

7.1 *(Choose paragraph 7.1 or 7.2, do not complete both.)*

    (a) The defendant is not a federal governmental agency, and the plaintiff [*check one box*] ☐ has not / ☒ has filed a charge or charges against the defendant asserting the acts of discrimination indicated in this complaint with any of the following government agencies:

    (i) ☒ the United States Equal Employment Opportunity Commission, on or about (month) **March** (day) **23** (year) **2009**.

    (ii) ☐ the Illinois Department of Human Rights, on or about (month) _____ (day) _____ (year) _____.

(b) If charges *were* filed with an agency indicated above, a copy of the charge is attached. ☒ YES. ☐ NO, but **plaintiff will file a copy of the charge within 14 days.**

It is the policy of both the Equal Employment Opportunity Commission and the Illinois Department of Human Rights to cross-file with the other agency all charges received. The plaintiff has no reason to believe that this policy was not followed in this case.

7.2 The defendant is a federal governmental agency, and
    (a) the plaintiff previously filed a Complaint of Employment Discrimination with the defendant asserting the acts of discrimination indicated in this court complaint.
        ☐ Yes (month) _____ (day) _____ (year) _____
        ☐ No, did not file Complaint of Employment Discrimination
    2. The plaintiff received a Final Agency Decision on (month) _____ (day) _____ (year) _____.
    c. Attached is a copy of the
        a. Complaint of Employment Discrimination,
        ☐ YES ☐ NO, but a copy will be filed within 14 days.

        (ii) Final Agency Decision
        ☐ YES ☐ NO, but a copy will be filed within 14 days.

8. *(Complete paragraph 8 only if defendant is not a federal governmental agency.)*

   (a) ☐ the United States Equal Employment Opportunity Commission has not issued a *Notice of Right to Sue*.

   (b) ☒ the United States Equal Employment Opportunity Commission has issued a *Notice of Right to Sue*, which was received by the plaintiff on (month) __12__ (day) __31__ (year) __2009__ a copy of which *Notice* is attached to this complaint.

9. The defendant discriminated against the plaintiff because of the plaintiff's *[check only those that apply]*:

   (a) ☐ Age (Age Discrimination Employment Act).
   (b) ☐ Color (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).
   (c) ☐ Disability (Americans with Disabilities Act or Rehabilitation Act)
   (d) ☐ National Origin (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).
   (e) ☒ Race (Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981).
   (f) ☐ Religion (Title VII of the Civil Rights Act of 1964)
   (g) ☐ Sex (Title VII of the Civil Rights Act of 1964)

10. If the defendant is a state, county, municipal (city, town or village) or other local governmental agency, plaintiff further alleges discrimination on the basis of race, color, or national origin (42 U.S.C. § 1983).

11. Jurisdiction over the statutory violation alleged is conferred as follows: for Title VII claims by 28 U.S.C.§1331, 28 U.S.C.§1343(a)(3), and 42 U.S.C.§2000e-5(f)(3); for 42 U.S.C.§1981 and §1983 by 42 U.S.C.§1988; for the A.D.E.A. by 42 U.S.C.§12117; for the Rehabilitation Act, 29 U.S.C. § 791.

12. The defendant *[check only those that apply]*

    (a) ☐ failed to hire the plaintiff.
    (b) ☒ terminated the plaintiff's employment.
    (c) ☐ failed to promote the plaintiff.

(d) ☐ failed to reasonably accommodate the plaintiff's religion.

(e) ☐ failed to reasonably accommodate the plaintiff's disabilities.

(f) ☐ failed to stop harassment;

(g) ☒ retaliated against the plaintiff because the plaintiff did something to assert rights protected by the laws identified in paragraphs 9 and 10 above;

(h) ☐ other (specify): _____

_____
_____
_____
_____
_____

13. The facts supporting the plaintiff's claim of discrimination are as follows:

See attached document
_____
_____
_____
_____
_____

14. [*AGE DISCRIMINATION ONLY*] Defendant knowingly, intentionally, and willfully discriminated against the plaintiff.

15. The plaintiff demands that the case be tried by a jury. ☒ YES ☐ NO

16. THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

(a) ☐ Direct the defendant to hire the plaintiff.

(b) ☐ Direct the defendant to re-employ the plaintiff.

(c) ☐ Direct the defendant to promote the plaintiff.

(d) ☐ Direct the defendant to reasonably accommodate the plaintiff's religion.

(e) ☐ Direct the defendant to reasonably accommodate the plaintiff's disabilities.

(f) ☐ Direct the defendant to (specify): _____

_____

_____

_____

_____

_____

(g) ☒ If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h) ☒ Grant such other relief as the Court may find appropriate.

(Plaintiff's signature)

_Jose' M. Flors._

(Plaintiff's name)

Jose Flores-Gomez

(Plaintiff's street address)

718 W Waveland Ave Apt. 3 N

(City) Chicago (State) IL (ZIP) 60613

(Plaintiff's telephone number) (480) - 747-2331

Date: 03-24-2010

1. On July 18, 2008, I was dismissed from Spiaggia restaurant, owned and operated by Levy Restaurants, after nearly 11 years of employment. Jason Goldsmith, general manager of Spiaggia, and Liz Whitrock, manager of Café Spiaggia, accused me of misconduct, but I believe that the true reason for my dismissal was my involvement in a racism case filed against the company by Kathleen Taylor, and my refusal to turn a blind eye to racism within the restaurant.

2. In June of 2008, I overheard Daniel Garretson, a food runner at Spiaggia Restaurant, talking to Max Meklin and Javier near the kitchen. He was talking about how much he hated black people because they are "obnoxious", "loud", "trashy", and "disgusting". He also said that '90% of prisons in the United States are full of black people because they are all criminals'. Mr. Meklin and I walked away from Mr. Garretson, and I commented to him that I didn't like hearing Mr. Garretson's comments, especially because we are both in minority communities (Mr. Meklin is Russian, and I am Latino).

3. I had previously heard Daniel Garretson make comments that I found offensive. In May of 2008, he had approached me and told me that one of the hostesses who is white, was dating a black man. He said it was "a shame" for a white woman to be dating a black man. He continued on, telling me why he didn't like black people, saying similar things to what he said the following month.

4. After the second occasion with Mr. Garretson, I spoke with Chad Bertelsman, floor manager at Spiaggia Restaurant. I told him what I had heard Mr. Garretson saying. The next day, Mr. Bertelsman asked me to write a statement about what had happened, which I did. Mr. Meklin and Javier were also asked to write statements, which Mr. Meklin did, but Javier declined. Daniel Garretson was first suspended pending investigation, and fired the following week.

5. Daniel Garretson is a close friend of Liz Whitrock, who was very upset when he was fired. Ms. Whitrock and Mr. Garretson had become friends through Brendan Smith, a bartender at Spiaggia Restaurant who was also intimate with Ms. Whitrock.

6. Just over a month later, I was fired. I believe that Max Meklin was afforded some protection by being very close friends with another manager, Ian Lousignau. I, on

the other hand, had spoken my mind about racism and problems at Spiaggia restaurant before.

7. Ms. Kathleen Taylor was fired from Spiaggia Restaurant in 2005. She filed a complaint with EEOC, and later filed a civil complaint against Levy Restaurants and Spiaggia. I was listed as a witness for her case. In the fall of 2007, Levy Restaurants' lawyers took statements from current Spiaggia Restaurant employees that had been listed as witnesses in Kathleen Taylor's case. These employees were Carlos Herrera, Ernesto Rosas, and myself.

8. Each of the witnesses was called individually to one of the private corporate offices to answer questions about Kathleen Taylor and the situation surrounding her termination. On the day I was questioned, Chad Bertelsman approached me in the lobby as I was arriving to work for the evening. He asked me to go upstairs to speak with the lawyer. When I arrived a secretary greeted me. She explained that I would be speaking to one of Levy Restaurants' lawyers, that he would ask me questions about the night that Kathleen Taylor was fired, and that my answers would be kept confidential and have no effect on my job.

9. I went into a private office to speak with the lawyer. He asked me a number of questions about the night Kathleen Taylor was fired and about how Chad Bertelsman behaved with employees. I answered all of his questions honestly and thoroughly, and openly admitted that I found Mr. Bertelsman to be unfair at times in his treatment of employees. I spent around 45 minutes answering his questions.

10. When I returned to the restaurant, Chad Bertelsman again intercepted me in the lobby, asking what I had told the lawyer and what happened. Later, Carlos Herrera told me he'd only spent 10 minutes with the lawyer, and Ernesto Rosas said he didn't answer any questions because he was afraid of losing his job. I am convinced that Mr. Bertelsman was made aware of the content of my answers to the lawyer, and that this absolutely impacted my job.

11. After Daniel Garretson was fired, I began to notice that Liz Whitrock, Chad Bertelsman, and Jason Goldsmith were treating me differently. I saw Liz glaring at me. She started changing the menus I put together for Café Spiaggia and had

been doing for 3 years. Whenever I tried to talk to her about the cheeses I was using in Café Spiaggia, she spoke to me with a very condescending attitude and disregarded my opinions and my efforts. Mr. Bertelsman began to repeatedly criticize my work and how much time I spent taking care of customers. Jason Goldsmith started watching my every move, and criticizing the most minor points. He would ask why I was in the office, why I needed more supplies, why I was using one computer rather than another, what I was doing at any given moment. These were question and criticisms that had never come up before.

12. The incident for which I was supposedly terminated, occurred on Friday July 11, 2008. Pauline Park, an employee of Levy Restaurants had made a reservation for that night, and requested my service for herself and her guests. I was employed at Spiaggia and Café Spiaggia as Formaggiaio (cheese specialist), and often presented cheese to VIP customers or returning customers who requested this service.

13. Ms. Park arrived around 6:00 p.m. on Friday July 11, 2008, along with three guests. I had been told of Ms. Park's request a day or two earlier, so I checked Café Spiaggia to see if they had arrived. When I approached the host stand, Liz Whitrock said to me "There are your people" and gestured towards the bar where Ms. Park's party was waiting. Ms. Whitrock said that she was thinking that she would seat them in the back room of the restaurant, but was not sure yet. I replied that I would return in a few minutes and greet them when they had been seated. When I walked through again about five minutes later, Ms. Park and her three guests were sitting at a booth near the host stand.

14. I approached the table and greeted Pauline Park and her guests. Ms. Park introduced me to her friends, two men and another woman. She told me that they were having dinner at Café Spiaggia to celebrate the recent engagement of two of her friends, and she wanted them to experience the cheese presentation.

15. I returned to the Spiaggia Dining Room to speak with Steven Alexander, Sommelier, manager, and Beverage Director, and found him in the wine room. As two of Ms. Park's guests were celebrating an engagement, which Spiaggia customarily acknowledges with complementary sparkling wine, I thought the

restaurant might want to bring some Prosecco (Italian sparkling wine) for them. I spoke with Steven Alexander, and explained that they were not only celebrating an engagement, but that Ms. Park was a company employee from "upstairs" (referring to the Levy corporate offices).

16. Steven Alexander chose a bottle of Non-vintage Prosecco di Valdobbiadene brut, La Tordera, from Veneto, Italy. He asked me to bring glasses to the table, and that he would follow to open the wine. I put four Champagne flutes on a tray, and carried them to Ms. Park's table. I introduced Ms. Park and her guests to Mr. Alexander, who opened the bottle of Prosecco and poured a glass for each guest. As Mr. Alexander was on his way back to the Dining Room, I told him that Ms. Park's table had requested cheese service, and I expected that they might also request wine pairings. Steven said "Yeah, Yeah! Go Ahead. Do whatever you want".

17. I returned to the table with the cheese cart, and presented cheeses to Ms. Park and her guests. They chose five cheeses, which I cut and then brought on a plate for the four of them to share. Ms. Park requested that I chose wines to complement their cheeses.

18. I chose four wines from the Dining Room wine list:
    a. 2007 Friulano, Marco Felluga, from Friuli Italy, $15 per glass
    b. 2007 Nerello Mascalese Rosato "Gerbino', Di Giovanna, from Sicilia Italy, $12 per glass.
    c. 2005 Pinea Rosso, Triacca, from Lombardia Italy, $15 per glass.
    d. 2003 Amarone della Valpolicella Classico, Corte dei Castaldi, from Veneto Italy, $26 per glass.

19. I poured less than two ounces of each wine for each guest. In total, I poured approximately 25 or 30 ounces, or four to five glasses, of wine (1 glass is measured at 5 to 6 ounces). If Ms. Park had been charged full price for these four wines, the cost would have been around $75. As Spiaggia's markup for wines, especially by the glass, is quite high, this amount of wine would have cost wholesale, around $15.

20. As the restaurant was quite busy that night, I returned to the main Dining Room, and quickly became engrossed in my work. When Ms. Park's table had finished their meal, their waiter, Harold Mendez came to me and asked about a price for the cheese and wine I had brought to the table. I gave him the standard price, $25, for the cheeses, and tried to find Steven Alexander to get a price for the wines. I first looked for him the wine room, and then checked to manager's offices, but couldn't find him, nor did I see either of the other managers working that night (Liz Whitrock and Chad Bertelsman).

21. At that time, the restaurant was very busy and I had several tables waiting for cheese service. I took the cheese cart to table 23, and spent 10 or 15 minutes on my presentation. When I returned to the cheese station, Harold Mendez was still waiting for a price for the wines. I asked him to wait a little longer so I could look again for Mr. Alexander. Again I looked in the wine room and managers offices, but still didn't find Mr. Alexander or any other manager. I asked one of the Captains if they had seen Mr. Alexander, and he told me 'I think he left. I saw him walking out'.

22. Again, I returned to the cheese station. I knew that Ms. Park and her table were waiting for a check, that Mr. Mendez likely had a number of other tables that required his attention, and that I had several other tables waiting for cheese service. I could not spend any more time searching for someone to make a decision, as too many customers were waiting. I told Harold that I could not find a manager and I didn't know how much they would want to charge for the wine pairings. I figured that because Steven Alexander had brought Prosecco, and because Pauline Park was an employee of the company, that Spiaggia might not want to charge for those wines. I said to charge for the cheeses I brought, and for everything that Ms. Park's table had ordered after the cheeses, but as I didn't know a correct price for the wine pairings, not to charge for them.

23. I was unable to find him, and later learned that he had been sent home early, which was highly unusual for a weekend night. I was also unable to find Liz Whitrock, or Chad Bertelsman, another manager at Spiaggia. In the mean time, Ms. Park was waiting for her bill, and her server needed an answer regarding

price of wine. I told him that as I understood it, the restaurant typically treated Levy company employees as VIPs, often giving away wine, food, or entire meals. As I couldn't get an answer from Steven or any other manager, I told the server not to charge for the tasting of wines. About 10 minutes later, Chad Bertelsman approached me, and asked if I was buying wine for Ms. Park's table. I replied that as I couldn't find Steven I had told the server not to charge for those wines. The bill had not yet been presented to the table, so I told Mr. Bertelsman that he could charge any amount he liked. He answered, "Don't worry about it. I will talk to Liz." Mr. Bertelsman and Ms. Witrock chose not to add anything to the bill.

24. One week later, I was called to the office as I was beginning my shift. I sat down with Jason Goldsmith and Ms. Whitrock. Mr. Goldsmith informed me that I was being let go. He thanked me for taking such good care of Ms. Park's table, but said that as Spiaggia is not my restaurant, I had no right to give anything away to anyone. In my experience, buying food or drinks for guests was commonplace at Spiaggia. It is expected that employees make all guests feel 'special', and unfortunately, it is not always clear how this should be accomplished. Levy's company policy is not to give away more than $100.00 worth of product, and Ms. Whitrock reported that I had done so. I estimate that the retail value of the wines that I did not to charge for would have been around $75.00, or approximately $15.00 wholesale cost. Additionally, Ms. Whitrock and Mr. Bertelsman had had opportunity to add these wines to Ms. Park's bill, and had made the final decision not to do so.

25. I was never given an opportunity to present my version of that night's events. I was never asked whether the accusations made by Ms. Whitrock were accurate (they were not). I had never before been disciplined or criticized for giving product away, and never given an opportunity to change my behavior or make right the situation.

26. At the time I was fired, I had worked for Levy Restaurants and Spiaggia Restaurant for almost 11 years. In 2005, Tony Mantuano, chef/partner of Spiaggia Restaurant, invited me to return to the restaurant after a 6 month

absence. I was re-hired to take care of the cheese program at Spiaggia, and did this job to the best of my ability for 3 years. In those 3 years since I had returned, I had received numerous complements on my knowledge and service, several positive secret-shopper reports, and only a single negative write-up for failing to say hello to one of my superiors. With such overwhelmingly positive feedback, I can only conclude that my termination was a result of my involvement in other issues.

27. I am certain that my participation with the cases of Daniel Garretson and Kathleen Taylor were the actual reasons for by dismissal by Spiaggia. After my involvement with the termination of Mr. Garretson, the managers Ms. Whitrock, Mr. Bertelsman, and Mr. Goldsmith approached me with condescending and aggressive attitudes. The manager's behavior towards me seemed to reflect their dislike for me, as they began looking for a way to terminate my employment. My termination was actually retribution for my involvement in a case against Spiaggia and for speaking out against racism.

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 440-2009-03340 |

**Illinois Department Of Human Rights** and EEOC
*State or local Agency, if any*

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Jose Flores-Gomez | (480) 747-2331 | 02-18-1969 |

Street Address — City, State and ZIP Code
720 W. Waveland, Apt 2e, Chicago, IL 60613

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| SPIAGGIA RESTAURANT & CAFE | 101 - 200 | (312) 335-5075 |

Street Address — City, State and ZIP Code
980 N. Michigan Ave, Chicago, IL 60611

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest — Latest: 07-18-2008
☐ CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s))*:

I began working for the Respondent in September 1997. My most recent position was Cheese Specialist. During my employment, I was subjected to a racially hostile work environment. On or about June 12, 2008, I lodged an internal complaint about a co-worker's racially derogatory remarks. On or about July 18, 2008, I was discharged for not charging a customer for wine. Similarly situated employees who engage in similar misconduct are not discharged.

I believe I have been discriminated against because of my race, White, and retaliated against for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

RECEIVED EEOC
MAR 23 2009

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY — *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

I declare under penalty of perjury that the above is true and correct.

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

Mar 23, 2009 — *Jose M. Flores* (Charging Party Signature)

EEOC Form 161*(11/09)     **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

To: **Jose Flores-Gomez**
718 W Waveland, Apt 3n
Chicago, IL 60613

From: **Chicago District Office**
500 West Madison St
Suite 2000
Chicago, IL 60661

**CERTIFIED MAIL 7001 1940 0003 8824 9453**

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 440-2009-03340 | **Michael J. Honkanen,** Investigator | (312) 353-7312 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*John P. Rowe*     12/30/09
**John P. Rowe,**
**District Director**
(Date Mailed)

Enclosures(s)

cc: **SPIAGGIA**